230 So.2d 640 (1970)
JOLLEY ELEVATOR COMPANY, a Commercial Partnership, consisting of Virgil P. Jolley and Joe M. Jolley
v.
SCHWEGMANN BROS. GIANT SUPER MARKETS, a Commercial Partnership.
No. 3715.
Court of Appeal of Louisiana, Fourth Circuit.
January 12, 1970.
Rehearing Denied February 2, 1970.
Writ Refused April 3, 1970.
*641 Dudley Yoedicke, New Orleans, for plaintiff-appellee.
Tucker & Schonekas, James Foley, III, and Russell J. Schonekas, New Orleans, for defendant-appellant.
Before REGAN, CHASEZ and HALL, JJ.
CHASEZ, Judge.
This is an appeal from a judgment in favor of Jolley Elevator Company (Jolley) against Schwegmann Bros. Giant Super Markets, (Schwegmann) in the amount of $3,150.90, plus interest and costs. The basis of the suit was an alleged violation of a contractual agreement between Jolley and Schwegmann for the purchase and installation of an elevator for Schwegmann's Gentilly store in New Orleans.
The facts as they emerge from the record are that some time in 1965 negotiations began between Jolley and Schwegmann for installation of this elevator. Several meetings were held and on April 26, 1966, a final meeting was held at Schwegmann's store. Present at the meeting were Mr. V. P. Jolley, Mr. John Schwegmann, Jr., Mr. Tsoi, architect for Schwegmann, and a Mr. Coincon, director of operations for Schwegmann.
The testimony of the parties is disputed as to what transpired at this meeting. Jolley testified that he and Schwegmann had agreed upon an elevator and its price, $12,376.00. He even stated that he and Schwegmann shook hands and Schwegmann said "it was a deal". Jolley further testified that at Schwegmann's suggestion he called his supplier, ESCO Elevators, Inc., in Fort Worth, Texas, while still at Schwegmann's store, and placed a verbal order for the materials necessary to build the elevator they had agreed on. Jolley also testified that after making the call he turned to Schwegmann and stated that it would take about 60 days to receive the material and another 30 days to install the elevator to which Schwegmann assented. *642 Throughout the proceedings, Jolley insisted that there was a verbal contract entered into between him and Schwegmann as of April 26, 1966.
Schwegmann testified that he did not remember any of the specifics, that he was extremely busy at all times and could not definitely state whether Jolley's version of the meeting was correct or not. Tsoi and Coincon denied there was a verbal contract but Coincon remembered the telephone call made by Jolley and even remembered that Schwegmann had given Jolley the nickel to make the phone call.
The following day, April 27, 1966, Jolley submitted a written proposal to Schwegmann, signed by Jolley, with instructions for Schwegmann to sign both copies and return one to Jolley. Schwegmann signed both copies but failed to return a copy to Jolley, and instead turned both of them over to his architect, Tsoi. Nothing more was done until May 5, 1966, when a meeting was called to discuss the installation of the elevator. Mr. Tsoi, Mr. Jolley and Mr. Bannister, representative of ESCO Elevators, Inc. were present. The meeting was necessary because under the terms of the contract the owner of the building was responsible for preparing the elevator shaft and hatchway and Mr. Tsoi had to discuss with Mr. Jolley the actual mechanics of installing the elevator and iron out any problems arising with respect to the exact dimensions required as the space available for installation was unique in that no hole could be made in the roof of the building because of its structure and other arrangements necessarily had to be made. At this meeting on May 5, 1966, Mr. Tsoi returned to Mr. Jolley a photostatic copy of the contract which Schwegmann had signed. During the course of the meeting, pencil notations of changes in the specifications were made on the copy of the contract. The dimensions of the floor were changed from 7 feet by 5 feet to seven and one-half feet by five feet. The capacity of the elevator was changed from 2500 pounds to 3000 pounds. This change in capacity necessitated an increase in horsepower of the motor from 20 horsepower to 25 horsepower. It was decided that an electric eye for the elevator would be installed but that this was to be an extra and a price of about $400.00 was agreed to by the parties. In all there were between six and ten changes to be made. The changes in the size of the elevator entailed an increase in the contract price of about $400.00 for the changes and an additional $400.00 for the electric eye. At the close of the meeting Tsoi requested Bannister and Jolley to redraw the specifications to include the changes. This was done and forwarded to Tsoi on May 10, 1966. On May 25, 1966 Jolley received a letter from Schwegmann requesting that he submit a competitive bid for the job of installing the elevator. Jolley refused, taking the position that there was no need to bid since a contract already existed between him and Schwegmann. Schwegmann denied this and received bids from other companies and ultimately the elevator was installed by another company. Jolley then brought this suit in November of 1966 for breach of contract. For damages he demanded his loss of profits on the job, some $2,159.00, as well as reimbursement for a cancellation fee he had to pay to ESCA Elevators, Inc. in the amount of $981.90.
As stated above, Schwegmann denied that there was a verbal contract reached on April 26, 1966. He further denied that there was a written contract. His denial is based primarily on the fact that the proposal sent to him by Jolley was not accepted because rather than return a signed copy of the proposal to Jolley, he forwarded both copies, after he had signed them, to his architect; that Jolley had no knowledge of any acceptance until the meeting of May 5, 1966 when a photostatic copy of the contract was returned to Jolley. Schwegmann also argued that there was no contract because his acceptance was based on a suspensive condition, i. e., his architect's approval, and that his architect did not approve but made changes in the proposal.
*643 We find the position of Schwegmann to be untenable. This court (as was the court a quo) is of the opinion that Jolley and Schwegmann entered into a verbal contract as of April 26, 1966, and the reduction of the agreement to writing, which Schwegmann signed, was a measure of sound business policy. The record reflects that Jolley contracted with Schwegmann to install an elevator in the latter's store and the details of the installation were relegated by Schwegmann to his Architect, Tsoi, who was to work them out with Jolley.
As hereinabove stated, the testimony of Jolley reflects that on April 26, 1966, in the presence of Schwegmann, he placed an order by long distance phone with his supplier, ESCO Elevators, Inc. for the necessary materials to execute the contract and then and there informed Schwegmann that the materials would be delivered in about sixty days. If there was no agreement, why would Jolley have ordered the material that he was sure to have to pay for?
Schwegmann testified that it was his practice to sign these proposals and then turn them over to the appropriate member of his organization for their consideration and that this never varied. Jolley testified that he had installed elevators in two of Schwegmann's other stores on prior occasions. We must then assume that he was aware of Schwegmann's business practices. If he knew he had no contract without the architect's approval, why would he order the material and proceed with the contract?
If this agreement was not a contract, why was Schwegmann's signature not scratched through and labeled "Void" before the copy of the contract was returned to Jolley at the meeting on May 5, 1966? Schwegmann could not refute Jolley's testimony, but stated only that he did not remember any details of the meeting and did not know whether Jolley's testimony was correct or not.
The record discloses that after the meeting of May 5, 1966 the specification which had been submitted by Jolley to Schwegmann with the amendments agreed to at the meeting were delivered to Jolley who was requested to re-draw the specifications to conform with the changes.
Jolley complied with this request. Thus it will be seen that the agreement bearing Schwegmann's signature and contemplating the changes approved by Schwegmann's architect confirms the contractual agreement reached on April 26th. When the contract was returned to Jolley he was not informed that the agreement of April 26th had been cancelled, but was told to make the changes agreed upon and add the electric eye. Was he to believe that there was no contract? We think not.
For the above mentioned reasons we affirm the trial court's finding that there was a contract and now turn to the question of damages.
Schwegmann has argued that in the event a contract was found that damages should not be allowed because they would be based on speculation.
The law is clear that damages will be allowed for loss of profits, L.S.A.-C.C. Art. 1934, Ferguson v. Britt, 191 La. 371, 185 So. 287 (1938). Our jurisprudence has established that while damages will not be allowed where the profits are uncertain or conjectural, absolute certainty is not required in proving lost profits. Ralph's Fleet, Inc. v. American Marine Corp., 157 So.2d 317, (La.App., 4th Cir. 1963); Germann v. 557 Tire Co., 167 La. 578, 120 So. 13 (1929). Since the amount of damages for breach of contract must be determined in relation to that contract and the circumstances which surround it, what will constitute "legal certainty" becomes a matter for decision in each individual case as it arises. Angelloz v. Humble Oil & Refining Co., 196 La. 604, 199 So. 656 (1940); Louisiana Farms Co. v. Yazoo & M. V. R. Co., 179 La. 539, 154 So. 445 (1934).
*644 Mr. Jolley submitted an estimate for the job at the time of entering the contract. Included in this estimate was his profit based on his cost of material and labor. He estimated his profit on material to be about $1779.00, on labor $300.00, and on the hatchway doors $80.00. This is a total of $2159.00 on the contract price of $12,376.00. On cross examination Mr. Jolley stated that his profit was estimated at 25% but would vary from job to job. Had he estimated 25% of the $12,376.00 involved in this case he would be claiming $3,094.00 as loss of profits. His estimate is conservative, if anything, and not unreasonable under the circumstance. The law does not require mathematical exactitude in determining loss of profits, only a reasonable certainty. In light of the fact that Schwegmann agreed to the price of $12,376.00 and had he not breached the contract, Mr. Jolley would have earned the $2159.00 as profit in performing the job, we find that the damages were not speculative or uncertain and were within the contemplation of the parties at the time of entering into the contract.
Under L.S.A.-C.C. art. 1934 the damages due the creditor for breach of the contract are not only the profit of which he has been deprived, but also the amount of loss he has sustained. The cancellation fee paid by Jolley to ESCO Elevators, Inc. in the amount of $981.90 is a loss within the meaning of article 1934. Schwegmann breached the contract after Jolley had already ordered the material from ESCO. Jolley was, therefore required to cancel his order. In doing so he incurred the cancellation fee of $981.90 as a penalty for cancelling his order. Mr. Jolley testified that this fee had been paid to ESCO. Had Schwegmann not breached the contract this fee would obviously not have been incurred by Jolley. We find that Jolley is entitled to reimbursement of the $981.90 as a portion of his damages because it is a loss sustained because of the breach of the contract.
The amount of the judgment rendered against Schwegmann in the lower court was $3,150.90, plus interest and costs.
However, we note that when the loss of profits of $2159.00 is added to the loss sustained by the cancellation fee of $981.90 the total is only $3,140.90. We therefore amend the judgment to read $3,140.90, plus interests and costs and affirm the lower court's judgment in all other respects. All costs of this court shall be borne by appellant.
Amended in part, and as amended, affirmed.